Tous Soto, Guardian, Etc., Plaintiff and Appellant, *v.* Chevremont, Defendant and Appellee.

## Appeal from the District Court of San Juan in an Action for Damages.

No. 2384.—Decided January 19, 1923.

Damages—Seduction—Nonsuit.—Sustaining a motion for nonsuit is equivalent to a judgment on a demurrer to the plaintiff's evidence and the court should sustain a motion of this kind with great caution and only in a case in which it is perfectly clear that the motion should be sustained.

Id.—Id.—Evidence—Corroboration—Promise of Marriage.—In an action for damages for seduction the law does not require corroboration of the testimony of the plaintiff nor make the promise of marriage a necessary element to establish a cause of action.

The facts are stated in the opinion.

*Mr. E. Lopez Tizol* for the appellant.

*Mr. L. Mendez Vaz* for the appellee.

Mr. Justice Hutchison delivered the opinion of the court.

Section 58 of the Code of Civil Procedure, heretofore discussed in *Román* v. *Vázquez,* 29 P. R. R. 736, provides that:

"An unmarried female may prosecute, as plaintiff, an action for for her own seduction, and may recover therein such damages, pecuniary or exemplary, as are assessed in her favor."

In an action thus authorized the court below sustained a motion for nonsuit for reasons stated as follows:

"Undoubtedly there has been a complete failure of proof in this case to justify a judgment in favor of the plaintiff and even the evidence examined at the trial was insufficiently presented. The essential element in an action of this kind, that is, deceit, false promises, artifice employed by the defendant to induce the alleged wronged woman to surrender her person to his desires, has not been completely demonstrated. There has been no evidence of persistence in the methods employed by the defendant to procure that his mendacious promises and cajolery should influence the feelings and mind of the victim in order to incline her to commit acts contrary to her desire and which she would not have committed otherwise. It appears, on the contrary, that the frivolous promise made by the defendant to the plaintiff that he would divorce himself in order to marry her instantly lost its character of sincerity and practicability and became a business arrangement by which the plaintiff agreed to live in a house which the defendant would provide for her, with the offer to supply her needs at all times.

"However this may have been, the fact is that the only evidence brought before the court as to the actual facts is the testimony of the alleged victim, and there was no other evidence, direct or circumstantial, to strenghten and corroborate it. If a child was born as a result of those transient relations, nothing was easier than to show the fact of its birth. And if there was a criminal prosecution for the abandonment of minors which terminated by the offer of the father to give the mother an allowance for its support, why was this tacit acknowledgment by the defendant of the acts imputed to him not brought to the attention of the court? It seems that within the limited circle of the acts said to have been committed by the defendant there were elements of proof easily available.

"We can not say that what has been suggested would have been sufficient to convince us fully of the defendant's liability. What we do say is that too much confidence has been placed in the plaintiff's testimony in regard to the essential element of this action and it is not necessary to discuss how dangerous it would be to decree an indemnity for damages of this class based only on the testimony of an interested party which is incomplete even on those points that could have been easily corroborated."

Upon the question of corroboration the trial judge seems to have overlooked several important details. The answer admits by way of negative pregnant that plaintiff, in December of 1916, visited the office of defendant, a dentist, as his patient. The answer further expressly avers that the acquaintance, which is said to have antedated the occasion last mentioned, soon ripened into more intimate relations, resulting in frequent visits by plaintiff to the *mirador* above the dental office. The answer also stated that upon the filing of a complaint by the plaintiff for the desertion of a child, and "in order to avoid the publicity always acquired by judicial controversy," defendant consented to pay $12 per month for the support of the child Rosalina, "without being able to say whether or not she is his daughter, as he never lived under the same roof with plaintiff; nor can he say whether she had relations with other men, as had been the case before knowing her." Moreover, plaintiff testified that the arrangements for the support of the child were made by defendant through his attorney of record herein, and there was no cross-examination by such attorney on this point. The sharp criticism by the court below of the supposed omission on the part of the plaintiff to adduce additional evidence bearing upon the birth of the child, upon the filing of a criminal complaint charging defendant with abandonment of his daughter and upon his evasion of the issue, not to say admission of responsibility in this regard, is, therefore, wholly without foundation.

The vague averments of the answer imputing to plaintiff a want of previous chaste character could not have received any consideration whatever in passing upon the motion for nonsuit. Also, notwithstanding the legal presumption of chastity and aside from any question as to burden of proof or admissibility of evidence in this regard that might have been but was not raised at the trial, it was admitted that two absent witnesses if present would have testified that

plaintiff at the time of her seduction was living in the home of these witnesses, a widow, Emilia del Llano, and her daughter, and had lived with them since she was two years of age and for a period of about fourteen years; that during all that time plaintiff had a good moral character and her conduct was that of an honest and honorable girl; that they had absolutely no complaint as to plaintiff's reputation, and that she enjoyed a good reputation for chastity and purity.

"Nonsuit is the name of a judgment given against plaintiff when he is unable to prove his case, or when he refuses or neglects to proceed to the trial of a cause after it has been put at issue, without determining such issue. It is of two kinds, voluntary and involuntary. \* \* \* An involuntary or compulsory nonsuit takes place where plaintiff, on being called, when his case is before the court for trial, neglects to appear, or when he has given no evidence on which a jury could find a verdict." 18 C. J. 1146.

Hence, as held by this court in *Rosado* v. *Ponce Ry. & Light Co.,* 18 P. R. R. 593, to quote the syllabus:

"In deciding a motion for nonsuit on the ground of the insufficiency of the plaintiff's evidence the court should admit as true all the facts to which the evidence introduced by the plaintiff refers. Sustaining a motion for nonsuit is equivalent to rendering a judgment on a demurrer to the evidence introduced by the plaintiff and courts should allow such motions with great care and only in cases where the propriety of granting such motion is perfectly clear."

Section 250 of the Code of Criminal Procedure provides, among other things, that:

"Upon a trial for seduction under promise of marriage, or for rape, the defendant cannot be convicted upon the testimony of the woman upon or with whom the offense was committed, unless her testimony is corroborated by other evidence."

But the instant case is not a prosecution for the statutory offense of seduction under promise of marriage, and we are not aware of any legislative enactment either requiring

corroboration of plaintiff's testimony or making the promise of marriage a necessary element of the tort involved in a civil action.

"At common law, the testimony of the prosecutrix or injured person, in the trial of offences against the chastity of women, was alone sufficient evidence to support a conviction; neither a second witness nor corroborating circumstances were necessary.  *  *  * Upon principle, this result was merely an instance of the general absence in our law of rules requiring a specified number of witnesses. As to policy, it seems to be sufficiently justified. In the first place, applying the canon already suggested in dealing with the treason-rule (*ante,* sec. 2037), the first condition justifying a rule of number does perhaps exist, namely, the frequency of false accusations of the class in question; but the second does not exist, namely, the relatively small disadvantages that would ensue in case a guilty man escaped through the lack of the required number of witnesses, for in none of these offences can such a view be taken of the consequences of letting such offences go unpunished. Furthermore, a rule of law requiring corroboration has probably little actual influence upon the juror's mind over and above that ordinary caution and suspicion which would naturally suggest itself for such charges; and the rule thus tends to become in practice merely a means of securing from the trial judge the utterance of a form of words which may chance to be erroneous and to lay the foundation for a new trial. Finally, the purpose of the rule is already completely attained by the judge's power to set aside a verdict upon insufficient evidence, and under this power verdicts are constantly set aside, in jurisdictions having a statutory rule, upon the same evidence which in other jurisdictions would be insufficient under the statutory rule requiring corroboration.

"Nevertheless, in many jurisdictions, a statute, based on a plausible but questionable purpose of protecting against false accusation, has introduced a rule requiring corroboration." 3 Wigmore on Evidence, p. 2757, sec. 2061.

"Three more or less definite forms of conduct on the part of the defendant may be detected from the authorities: first, false promises and artifice; second, solicitation and importunity; third, love making creating a desire in the woman for improper relations. While the three often concur and cannot be clearly distinguished, any one of the three elements appears to be sufficient to support

the action. Thus, recovery by the woman was allowed where the defendant, a man of wealth and mature years, visited a chaste girl, his employee, after dark, expressed affection for her, repeatedly caressed her, made promises of future friendship and assistance and finally debauched her. Though the court declared that something more than mere reluctance on the part of the woman was necessary, and that it must appear that her consent was obtained by flattery, false promises, artifice, urgent importunity, based on professions of attachment or the like, and that relying solely on such flattery, false promises, artifice and importunity, the woman must have surrendered her person to the defendant, a verdict in favor of the plaintiff was not disturbed. The reluctance of the woman to commit the act must be a reluctance that enticements and persuasions could not overcome without the presence of some other potent influence; such a state of facts should be proved as would convince a fair minded person that she had been deceived and deluded, and that her submission was in consequence of such deception and delusion. Persuasion and solicitation have been recognized as sufficient to charge the defendant with liability, without any element of deception, when the action is brought by the woman, as well as in actions by the parent. Thus, in an action for seduction, evidence that the defendant took the plaintiff, a girl sixteen years old, living with her parents and hitherto chaste, to a dance some distance from her home, that on their arrival he procured a bedroom for the express purpose of debauching her, and immediately commenced his indecent proposals, and that late at night they left the ball room and went to the bedroom at his solicitation, where he accomplished his purpose, was held to make such a case as should be submitted to the jury. So also, in an action by the parent it was held not necessary for the plaintiff to show that the defendant had used flattery or made false promises to his daughter, but that it would be sufficient if the seduction resulted from the solicitation and importunity of the defendant to the daughter to indulge in criminal intercouse, in consequence of which she consented. Love making as resulting in seduction is reported in several instances. Thus, in an action by the parent, continued attentions for several months, followed by improper intercourse, has been held to warrant the inference of seduction. In actions by the woman seduced, also, this form of conduct has been held sufficient to maintain the action. Thus, where a married man forty-two years old had sexual intercourse with his domestic, a girl fif-

teen years of age, after continuous daily love making for some months, it was held, in an action for seduction, that if the means made use of by the man were calculated to overcome the will of a girl of her years and experience, and were intended to create in her mind an affection for him, and did have that effect, and if under that influence she yielded her person to him, this amounted to an artifice, within the meaning of the law, and the sufficiency of the evidence to establish that fact and constitute it seduction was for the jury. So also, where a man stated to a girl seventeen years of age that he liked her the best of any girl he knew, that she would never be sorry and never regret it and that she could always live with him and be happy, it was held that he might be made liable for her seduction under a statute creating liability for seduction under such 'promise, artifice or influence as will overcome the scruples of a chaste woman.' * * * In conclusion, it must be admitted that no satisfactory standard has been adopted for determining what arts and promises are sufficient to constitute seduction. Each case must stand on its own facts. No particular arts or promises will, as a matter of law, constitute the offense so as to allow the woman to sue. It is generally a question for the jury to determine under proper instruction from the court.

"Though a promise of marriage is one of the means often resorted to by the seducer to accomplish his purpose, such promise is not a necessary element in seduction. In fact, certain authorities will not admit evidence of a promise of marriage in an action by the parent for seduction, though there is a conflict of authority on this question. Owing to the fact that a promise of marriage is unnecessary, a married man may be guilty of seduction, even though the woman knew that he was married." 24 R. C. L., p. 734, secs. 5 and 6.

Because of the interpretation placed by the court below upon the testimony of plaintiff we transcribe her statement verbatim as contained in the record:

"Angela López testified under oath as follows: That her name is Angela López; that she has resided in San Juan for four years, having come to San Juan in 1915; that she has known Emilio Chevremont since 1916; that while living at No. 19 Caleta de San Juan, the home of Emilia Llano, she suffered much from toothache and upon asking about a dentist they told her of him and one day

about two o'clock in the afternoon she went to his office and told him that she had toothache and wanted him to extract one of her teeth; that he told her to wait and when he finished with the person that he was treating he called her and told her that her teeth were in very bad condition; that he was going to extract the tooth, and that she should continue her visits; that he extracted the tooth, she paid him and went home and two or three days thereafter she had a severe toothache and went to him again because she was told that she might have an infection; that he told her to continue to come for treatment and to have her teeth extracted and that she went for about a month; that after she had been going there a month he commenced to question her indirectly for information; that he asked her where she lived, who she was, what was her name, why was she dressed in mourning, and afterwards began to woo her, telling her that he liked her very much, that she should love him, whether she had a beau, saying that he was single; that she rejected his advances, telling him that he was a married man and he replied that it did not matter, for although he was married he had brought an action for divorce and as soon as he was divorced he could marry her and would purchase a house and furnish it for her; that every time she went there he would say the same to her and this continued for about two or three months; that on one occasion he told her to look for a house and rent it, saying that he would furnish it so that they could live together, that he loved her and would support her, that she should remain with him, that he would never forget her, and she replied that she did not want to do that, that she did not dare, and then he told her that there was a room on the roof over his office that she could rent and live in; that on one occasion he told her to go to see the room and she was not disposed to do so, but one night while going from her home to the drug-store she found him standing at the door of the hallway and he called her and asked her to come inside and go to see the room and she replied that she did not dare, but he insisted that she enter and told her that no harm would come to her; that then she entered and he told her to remain there with him two or three hours, that she would not be harmed and in any event he would be responsible; that he loved her, and as he insisted she remained there with him; that this was about half past eight at night; that she remained there; that they talked there for about half an hour before she went up stairs; that they went up to the room on the roof and he entered; that

in the room there was nothing but two beds; that she then told him that if this was the house it was not properly furnished and asked him why he had taken her to a house in that condition; that he replied that it was in that condition because he had rented it a short time before and had not had time to do anything because he had been sick; that he went inside and carried a bottle in his hand which he uncorked; that he drank and gave her a drink and told her to remain; that she was seated on the bed and he sat down beside her and put his arm around her and while caressing her told her to remain, that no harm would come to her, that he assumed all responsibility; that she should love him; that she had told him that she loved him; that she could remain without fear; that she was poor and would find happiness with him; that she should love him and he would never abandon her; that she does not remember what it was that he gave her to drink;  *  *  * that she believes it was rum or brandy that he drank and gave her to drink; that afterwards he seated himself on the bed by her side and put his arm around her, took her hand in his and asked her if she loved him; that he did nothing else to her; that he asked her why she did not surrender to him, saying that this was her house, that if she did not like it she could look for another wherever she desired, and as he said that then she surrendered to him; that he stripped her; that the doors were shut; that he lay on the bed with her; that she did not undress herself, but he stripped her; that then he did nothing but lie by her side; that he did nothing more; that nothing else occurred, that he lay by her and kissed and embraced her . . . . .; that he did nothing more to her; that he lay on the bed with her; that they had sexual intercourse on that night; that she left there at about ten or half-past ten; that when they finished he told her to come again as soon as possible and then took her downstairs; that after that night she was ill for about fifteen days; that fifteen days later she went there again; that it was a result of this that she had been ill for about fifteen days, as a result of what had occurred with him; that she was ill for about fifteen days; that she went back to him to see what arrangement they could make and he asked her why she had not come before, what had happened to her; that she replied that she had been ill; that he then said that he was anxious to see her and that she should not have done that, but should have sent him word, and again commenced to do the same things, to tell her that he loved her, that she should remain there,

and to ask her what she was going to decide upon; that she again remained with him; that he then caressed her; that after all that he took her downstairs again; that they went to the room on the roof again before he took her downstairs; that they had sexual intercourse there again; that she believes this lasted for about two months; that the time was from November to January approximately, November of nineteen sixteen and January of nineteen seventeen; that as a result of these acts she became pregnant; that she informed Chevremont that she was pregnant; that at first he said that it could not be possible, that he did not believe it, and every time she told him so he replied that it could not be possible, that she was not pregnant, and one day told her that if she was pregnant the child was not his; that thereafter he did not treat her with the same kindness and love as before; that thereafter he did not renew his former offers; that while they had such relations he did not give her money or make her presents, but he treated her well at that time; that he accepted payment the first and second times for the work done to her teeth, but afterwards he charged her nothing; that she gave birth to the child nine months after having sexual intercourse with him; that he helped her because she informed him that she was about to give birth to the child; that the only thing he told her was to send for money; that she did send; that he sent her money two or three times, but she does not remember the amount; that she used the money he sent her to pay a part of her expenses; that if he had not made her all the offers he did she would not have surrendered to him because she was not actually in need; that she surrendered to him because she believed in his promises and in everything he said to her; that after she gave birth to the child she went to him for money; that sometimes he gave her money and other times not; that she told him what the money was for; that it was for the expenses of the child; that sometimes he gave her money, small amounts; that on one occasion he refused to give her anything and thereupon she went to the court to lay the matter before the district attorney; that she told him everyting that had passed between her and the defendant; that as a result of what she told the district attorney the complaint was filed and they came to the office of the district attorney, but she does not know what he said; when questioned whether she knew what a complaint was she replied that first she went to make the accusation and afterwards the criminal complaint was filed; that she swore to that complaint

or accusation; that as a result of that complaint Chevremont, by his attorney Méndez Vaz, called on her and asked her to withdraw the complaint and Chevremont would give her $12 monthly for the child; that she accepted the $12 because she did not want to give publicity to the matter, she had no witnesses and was ill, and therefore accepted the amount; that Chevremont is giving her $12 monthly at present; that she always goes for the $12 every month and it is paid to her and she gives a receipt for it; that the $12 is for the support of the child and he gives her nothing for herself; that she does not remember exactly how long he has been paying that amount; that it is still being paid to her. When questioned whether Chevremont at any time had attempted to take charge of the child she replied that attorney Méndez Vaz came to her and said that Chevremont was willing to take the child; that she should take the child to Chevremont and he would receive it; that he had said that he wanted the child so as to educate it and keep it; that he said that he would keep it at the house of himself and his sisters; that she did not surrender the child because she did not trust him; that her age is about nineteen or twenty years; that she was born in Mayagüez; that she is not sure whether she was registered in the civil register; that she knows steps have been taken to procure a certificate of her birth, but it has not been obtained; that she does not know why her name does not appear in the civil register; that her opinion about her age is based on the statement of persons who knew her father. The defendant objected on the ground that this was hearsay and the court sustained the objection. That her father is dead: that she has stated that her name does not appear in the civil register; that she is twenty years old; that when this happened she was sixteen or seventeen years old; that she is sure of this. * * * That she believed Chevremont was in a position to fulfill all of his promises to her; that she believed him because he told her to do so and besides she often heard it said that he was a rich man; that owing to the appearance and condition of his house she thought he was a rich man and that he would purchase a house for her and make her happy, and that he would marry her after he was divorced; that Chevremont is not a young man; that he is older than she is; that she thinks his age must be twice her's; that under those circumstances she believed him; that he is engaged in his profession as a dentist in San Juan; that the witness is an orphan; that her mother died in '05 and her father in '16; that she came to

San Juan in 1915; that she is poor and was poor at the time of this occurrence. On examination by the defendant the witness stated that she had testified that she knew Chevremont because she went to his office to have her teeth treated; that she is sure this was the first time she met him; that prior to this she had not been a servant in the home of Chevremont * * * that she had not been in the service of the Chevremont family; that she does not remember having been in the service of or having lived for a time at No. 72 San Francisco Street in the home of Emilio Chevremont; that since she came to San Juan the only place where she lived prior to the occurrence was in the home of Emilia Llano; that she does not know Emma Hernaiz, the wife of Chevremont * * * that Chevremont had his office on the corner of San Francisco and Cruz Sts.; that it was next to the office of notary Damián Monserrat; that she went on several occasions to have her teeth treated; that Chevremont made love to her; that she said that she went there one night at 8 o'clock; that there was nobody in the Chevremont's room; that they were alone; that on the day they went up to the room she told him that she loved him; that they remained there until half-past ten or eleven at night."

The district judge makes no mention of the evidence as to the previous good character and exemplary conduct of plaintiff. The opening proposition that there was a complete failure of proof is, to say the least, not consistent with the ensuing comment which, in attempting to point out the unestablished essentials, not only discloses a mistaken idea as to the supposed necessity of a promise of marriage and as to the need of corroboration, but also shows that the admissions and positive averments of the answer were entirely ignored.

No doubt courts should be cautious in cases of this kind, and the proof must be clear and convincing; but this does not mean that plaintiff shall produce eye-witnesses to the means employed by defendant to accomplish his purpose. Judges in their zeal to protect the rights of honest men must remember that the rule in question was not made to favor the escape of unscrupulous knaves, and that an honest plain-

tiff also has some rights. Otherwise the statute first above mentioned would become a dead letter, and the class for whose benefit the law was enacted would be left without remedy for one of the most cruel wrongs that can be inflicted upon a woman.

Of course, nothing herein should be construed as indicating an opinion upon the merits of the case that may be developed by all the evidence for both sides. But, as already pointed out, for the purposes of nonsuit we must take the testimony for plaintiff as true. So regarded, the proof is clear and convincing and affords no reasonable basis for the conclusion reached below.

Defendant did not say bluntly to plaintiff: "If you will become my mistress I will furnish you a house and feed and clothe you, provide you with money to meet your reasonable needs and will never abandon you." Even such a false promise, implying as it does at least the semblance of a permanent home together with the necessary, perhaps some of the comforts of life, if made by a well matured man of means and whispered into the yearning consciousness of an unsophisticated and penniless orphan might suffice to support an action. But that is not all. Here we have a girl of sixteen already accustomed to the conversation of defendant and to the physical contact of his hands in a professional capacity, through visits to his office as a patient extending over a period of a month or more. In the course of these visits solicitous personal inquiries addressed to plaintiff are followed by professions of attachment and affection, by the pleading of a lover who poses as being "married but not mated," and about to be divorced, whereupon he will be free to marry plaintiff. And this goes on for several months. The offer of a furnished house and invitations to inspect the *mirador* above the office are at first declined, but defendant is persistent in his importunity.

Finally he succeeds in inducing plaintiff to enter the *mirador,* after repeated assurances that nothing would happen to her and the visits prolonged by renewed assurances of the same kind plainly designed to allay any suspicion that plaintiff might have had and apparently did have, as to an improper motive. Later, drinks are served. The love-making is resumed, accompanied now by caresses. The inducement is no longer, if it ever was, the mere payment of house rent, but a vision of future happiness in such strik- ing contrast to existing conditions that the sympathetic allusion to these conditions was no doubt superfluous as a gentle reminder to plaintiff. It may be that the evidence for the defense will give a different color to the case when finally submitted for decision on the merits. But as the matter now stands we are unable to concur in the view taken by the court below in ruling upon the motion for nonsuit.

Appellant also complains of an order overruling a motion to make more specific, among other things, a paragraph of the answer which reads as follows:

"Defendant denies, of his own knowledge, that plaintiff was, in the month of December of 1916 and two years before, a chaste, pure and undefiled woman; and he avers to the contrary that at that time she was known to be living in public concubinage in Mayagüez, first at a house in Méndez Vigo Street, now Hostos Street, and afterwards in the ward of Guanajibo of the said municipality, according to information which defendant believes to be true."

We are inclined to agree that plaintiff was entitled to a more specific averment in this regard; but, in the absence of any citation of authority in support of the contention and inasmuch as the parties will have an opportunity to present the same question again and perhaps more fully to the consideration of the district court, we need not determine the point at this time.

The judgment appealed from must be reversed and the

case remanded for further proceedings not inconsistent herewith.

*Reversed and remanded.*

Chief Justice Del Toro and Justice Wolf concurred. Justices Aldrey and Franco Soto dissented.